IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
COOKEVILLE DIVISION

KRISTI L. WHITED and SHELBY LONG, )
)
    **Plaintiffs,** )
)
v. )    Case No. 2:10-cv-0016
)    Judge Trauger
**STATE OF TENNESSEE,** )
)
    **Defendant.** )

## MEMORANDUM

Pending before the court is the Motion for Summary Judgment filed by the defendant (Docket No. 21), to which the plaintiff has filed a response (Docket No. 30), and in support of which the defendant has filed a reply (Docket No. 36). For the reasons discussed below, the defendant's motion will be granted in part and denied in part.

## FACTS

The plaintiffs, Shelby Long and her daughter, Kristi Whited, are housekeeping workers at Standing Stone State Park in Overton County, Tennessee.[1] They are employed by the Department of Environment and Conservation ("TDEC") of the defendant, the State of Tennessee. The plaintiffs' primary responsibility is to clean the park's rental cabins.

This dispute stems from the actions of the plaintiffs' former supervisor, Joe Davis, at a

---

[1] Unless otherwise noted, the facts are drawn from the defendant's statement of undisputed facts (Docket No. 24), the plaintiff's response thereto (Docket No. 35), and related exhibits. The court draws all reasonable inferences in favor of the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Brown v. United States*, 583 F.3d 916, 919 (6th Cir. 2009).

1

December 2007 employee Christmas party. Davis arrived at the party drunk. At one point, he placed his head in Long's lap while she was seated; shortly thereafter, he grabbed Long's buttocks while they were standing in line for food. After that, Davis told Whited that she should join him and his girlfriend for a threesome. All of these incidents occurred in front of other employees. Eventually, Dale Mabry, the park superintendent, asked a maintenance worker to escort Davis home.

In the following months, neither Whited nor Long filed any internal or external complaint about Davis's behavior. But, in March 2008, a male co-worker submitted a complaint to TDEC regarding Davis that mentioned the Christmas party incidents. TDEC determined that Davis had potentially violated the department's workplace harassment policy, and it launched an investigation in April and May of 2008.

Whited claims that Davis and Mabry asked her to lie to the investigators and attempted to coach her answers. Specifically, she testified that Mabry told her: "[J]ust tell them that we've talked about it. That everything's fine. That we've worked it out, and that you're sorry that they wasted their time." (Docket No. 24, Ex. 1 at 40.) Whited refused to do this, however, and both plaintiffs cooperated with the investigators.

During the investigation, Davis admitted the allegations against him. TDEC ultimately determined that Davis had violated the harassment policy and suspended him without pay for 15 days. Six months after the incident, Mabry retired as park superintendent, and interim superintendent Dave England replaced him. In October 2009, England was permanently replaced by Chris Cole, who had been working as a ranger at a different state park.

Cole instituted several structural changes in the operation of the park. Previously, the plaintiffs and other maintenance workers were supervised by Davis. Cole determined that the plaintiffs, who were primarily responsible for housekeeping, should be separated from the maintenance staff, and he placed them under the supervision of park ranger Travis Stover. As a result, the plaintiffs are now required to clock in and out at a park office instead of at the maintenance shed. Unlike Davis, Stover requires the plaintiffs to sign an assignment sheet that lists the cabins that they have cleaned during the day. Stover also requires the plaintiffs to carry radios and to notify him after they have cleaned each cabin.

The plaintiffs claim that, because of their cooperation with the investigation, they have been subjected to a string of retaliatory actions by Davis, Mabry, Cole, and other co-workers. They allege that:

> (1) Davis "stalked" them by driving by their work site as many as 20 times a day and by watching them from afar;
>
> (2) Davis treated them poorly, often ignoring them and refusing to communicate by anything other than grunts or scowls;
>
> (3) Mabry refused to hear their complaints about Davis and instead instructed them to voice any concerns directly to Davis;
>
> (4) Davis and Mabry "ostracized" the plaintiffs and others who cooperated in the investigation by assigning them to wash blankets for two or three weeks following the investigation;
>
> (5) they have been ostracized and singled out by the administrative changes that

Cole and Stover instituted;

(6) their workload has increased, they are now forced to work every Sunday during the summer, and they are now sometimes separated from each other during the work day;

(7) somebody repeatedly hid the state-owned van that the plaintiffs use for work or hid the van's keys;

(8) somebody cut wires in the plaintiffs' personal radio and destroyed a stuffed animal that belonged to them; and

(9) somebody once placed a nail or tack on plaintiff Long's chair.[2]

The plaintiffs have suffered no formal disciplinary actions. They have not been demoted, and their pay has not changed.

The plaintiffs filed a charge with the EEOC and subsequently filed this lawsuit. Their Complaint contains claims for sexual discrimination, hostile work environment, and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* (Docket No. 1 ¶¶ 26-29.) The defendant has now filed a Motion for Summary Judgment, pursuant to Federal Rule of Civil Procedure 56. In the face of the defendant's motion, the plaintiffs have conceded that their sexual-discrimination and hostile-work-environment claims are meritless (Docket No. 30 at 1

---

[2] At their depositions, the plaintiffs mentioned various other examples of alleged harassment, including (1) supposedly harassing posters hung in the maintenance shed, (2) being forced to re-clean certain cabins, (3) an incident in which Mabry told Whited that he could not stand her voice, and (4) an incident in which the plaintiffs were denied free food. The plaintiffs' brief does not mention these incidents, however. (*See* Docket No. 30 at 3-4, 8.) The court will assume that the plaintiffs concede that these incidents do not constitute unlawful retaliation.

n.1), so the court will dismiss those claims. The only remaining claim at issue is the retaliation claim.

## ANALYSIS

I. **Summary Judgment Standard**

Rule 56 requires the court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If a moving defendant shows that there is no genuine issue of material fact as to at least one essential element of the plaintiff's claim, the burden shifts to the plaintiff to provide evidence beyond the pleadings "set[ting] forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "In evaluating the evidence, the court must draw all inferences in the light most favorable to the [plaintiff]." *Moldowan*, 578 F.3d at 374.

At this stage, "'the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). But "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient," and the plaintiff's proof must be more than "merely colorable." *Anderson*, 477 U.S. at 249, 252. An issue of fact is "genuine" only if a reasonable jury could find for the plaintiff. *Moldowan*, 578 F.3d at 374 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

II. **Retaliation**

The defendant argues that the allegedly retaliatory actions mentioned by the plaintiffs are not severe enough to constitute actionable retaliation and are not causally related to the TDEC investigation. (Docket No. 23 at 10-21.)

In Title VII retaliation cases, the court applies the familiar *McDonnell Douglas* burden-shifting framework to determine whether a plaintiff's circumstantial evidence of retaliation is sufficient. *Chen v. Dow Chem. Co.*, 580 F.3d 394, 402 (6th Cir. 2009); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). First, a plaintiff must establish a prima facie claim by showing that:

> 1) she engaged in activity protected by Title VII; (2) this exercise of protected rights was known to defendant; (3) defendant thereafter took adverse employment action against the plaintiff, or the plaintiff was subjected to severe or pervasive retaliatory harassment by a supervisor; and (4) there was a causal connection between the protected activity and the adverse employment action or harassment.

*Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 595 (6th Cir. 2007). "The burden of establishing a prima facie case is not an onerous one and is easily satisfied." *Russell v. Univ. of Toledo*, 537 F.3d 596, 609 (6th Cir. 2008). Here, the existence of the first two elements are undisputed.

To show an "adverse employment action," "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006) (quotation marks omitted). Thus, the plaintiff must have suffered more than "trivial harms" or "'the

ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing.'" *Id.* (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)). Nevertheless, the burden of showing an adverse action is "less onerous in the retaliation context than in the anti-discrimination context." *Michael*, 496 F.3d at 595-96.

To show causation, "a plaintiff must proffer evidence sufficient to raise the inference that her protected activity was the likely reason for the adverse action." *Id.* at 596 (quotation marks omitted). "[W]here some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality." *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008).

Once a plaintiff has established a prima facie claim, the burden shifts to the defendant to articulate a "legitimate, nondiscriminatory reason" for its actions. *Russell*, 537 F.3d at 604. The burden then shifts back to the plaintiff to demonstrate that the proffered reason was merely pretextual. *Id.* "To establish such pretext, a plaintiff must show 'either (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate [the employment action], or (3) that they were insufficient to motivate [the employment action].'" *Id.* (quoting *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994)); *see also Singleton v. Select Specialty Hosp. - Lexington, Inc.*, 391 Fed. Appx. 395, 400 (6th Cir. 2010).

Here, the plaintiffs have produced enough evidence to show that, following their cooperation with TDEC's investigation, they faced actionable retaliatory harassment from their

supervisor, Joe Davis.  Plaintiff Long's affidavit states that, after the investigation, Davis "would almost never talk to [the plaintiffs]."  (Docket No. 32 ¶ 6.)  Instead, according to Whited, he "refused to [do] anything but grunt or scowl at [them]."  (Docket No. 31 ¶ 13; *see also* Docket No. 24, Ex. 2 at 48 (Whited's testimony that Davis would make a noise that "sounded like a growl – grunt noise" when the plaintiffs attempted to communicate with him).)  According to the affidavit of Donnie Davis, a co-worker who also cooperated with TDEC's investigation, Joe Davis "refused to talk to [the plaintiffs] about park business" and instead would "simply grunt[,] which was an indication that he was angry and wanted you to know he was angry."  (Docket No. 34 ¶ 6.)  Furthermore, there is evidence that Mabry refused to discuss these issues with the plaintiffs, instead telling them to address their concerns to Davis.  (Docket No. 24, Ex. 2 at 48.)

The affidavits of both plaintiffs also claim that Davis "stalk[ed]" them.  (Docket No. 31 ¶ 6; Docket No. 31 ¶ 13.)  Their co-worker's affidavit recounts one instance where Davis drove by Long 19 times in a three-hour period, in an attempt "to harass and retaliate [against]" Long.  (Docket No. 34 ¶ 7.)  Similarly, at her deposition, Whited testified that Davis "sometimes" would drive by her work site as many as 20 times per day or would "sit on the hill and watch where we were at."  (Docket No. 24, Ex. 1 at 47.)  Although the plaintiffs do not specify exactly how often Davis did this, their evidence is sufficient for a reasonable juror to conclude that Davis was attempting to intimidate them.

The defendant argues that, because Davis never made verbal or physical threats, his conduct was not unlawful.  (Docket No. 23 at 16.)  But it is possible for a supervisor to harass employees without making explicit threats.  In *Morris v. Oldham County Fiscal Court*, 201 F.3d

8

784 (6th Cir. 2000), the Sixth Circuit found that the plaintiff had sufficiently shown retaliatory harassment when she presented evidence that her former supervisor:

> (1) visited [her workplace] unaccompanied a total of fifteen times, and called [the plaintiff] on the telephone over thirty times, despite Black's warnings, solely for the purpose of harassing [the plaintiff]; (2) drove to [her workplace] on several occasions, and simply sat in his truck outside the Department building, looking in [her] window and making faces at her; (3) followed [the plaintiff] home from work one day, pulled his vehicle up beside her mailbox, and gave her "the finger"; (4) destroyed the television [the plaintiff] occasionally watched at [her workplace]; and (5) threw roofing nails onto her home driveway on several occasions.

*Id.* at 793; *see also, e.g.*, *Allen v. Ohio Dep't of Job & Family Servs.*, 697 F. Supp. 2d 854, 903 (S.D. Ohio 2010) (finding evidence of retaliatory harassment when a supervisor, among other things, "began communicating with [the plaintiff] only by email" and "generally treated [the plaintiff] with hostility"); *cf. Vaughn v. Louisville Water Co.*, 302 Fed. Appx. 337, 341, 348-49 (6th Cir. 2008) (finding no adverse action when a co-worker once stared at the plaintiff from his car and once stared at the plaintiff during a party). Here, Davis's alleged actions are not as severe as the supervisor's actions in *Morris*; for example, he did not follow the plaintiffs home. His actions do, however, exceed the non-actionable conduct listed by the Supreme Court in *Burlington*, such as occasional teasing.

In addition, there is evidence that the plaintiffs were assigned excessive work following the TDEC investigation. The affidavit of the plaintiffs' co-worker states that they "were given heavier workloads" that were "disproportionate" to the workloads of employees who did not cooperate in the investigation. (Docket No. 34 ¶ 11.) At her deposition, Whited testified that, in

9

the spring and summer of 2008, their workload tripled, or at least "did go up somewhat."[3]

(Docket No. 24, Ex. 2 at 137, 140; *see also* Docket No. 31 ¶ 13 ("My mother and I have had an increased workload in terms of cabin cleaning.").) In addition, Long's affidavit states that the plaintiffs "have to clean more cabins than the other workers." (Docket No. 32 ¶ 6.) There is also evidence that, in the months following the investigation, the plaintiffs received certain less-desirable work assignments, including being forced to climb onto buildings' roofs to clean gutters. (Docket No. 24, Ex. 2 at 128.)

Taken together, this evidence is enough for a juror to conclude that the plaintiffs faced adverse employment actions. Certainly, a reasonable employee might choose to not cooperate with an employer's investigation if it means that she will receive a heavier workload, that her supervisor will stop talking to her regarding workplace matters, and that her supervisor will attempt to intimidate her. Furthermore, these alleged actions began in the months immediately following the TDEC investigation, and they were taken primarily by Davis himself, who was suspended as a result of the investigation.[4] This is enough to show a causal connection to the

---

[3] The defendant points out that, earlier in her deposition, Whited testified that she "wouldn't say necessarily" that her workload increased. (Docket No. 24, Ex. 2 at 130.) Obviously, this is inconsistent with her testimony that her workload tripled, as well as the assertion in her affidavit that her workload increased. (Docket No. 31 ¶ 13.) Typically, a plaintiff may not submit an affidavit that contradicts her earlier deposition testimony. *Trout v. FirstEnergy Generation Corp.*, 339 Fed. Appx. 560, 566 (6th Cir. 2009). But, as here, if the plaintiff's deposition testimony is internally inconsistent, a later affidavit may present the more favorable version of the facts. *O'Brien v. Ed Donnelly Enters.*, 575 F.3d 567, 593 (6th Cir. 2009). It will be the jury's job at trial to determine Whited's credibility. *Schreiber v. Moe*, 596 F.3d 323, 333 (6th Cir. 2010).

[4] The defendant argues that Davis had no motive to retaliate, because he admitted to the investigators that the allegations against him were true. (Docket No. 23 at 11.) This is

investigation. Thus, the plaintiffs have shown a prima facie claim, and the defendant has not proffered a legitimate reason for Davis's actions.

The remainder of the plaintiffs' allegations, however, cannot support a retaliation claim. Essentially, the plaintiffs catalog every perceived slight that occurred in the two years following the Christmas party and attribute a retaliatory motive to those actions.

The plaintiffs claim that somebody occasionally hid the state-owned van that the plaintiffs drove to the cabins. But there is no evidence that Davis was the person hiding the van.[5] According to Cole's affidavit, other employees sometimes use the vehicle, which might explain some of the instances. (Docket No. 24, Ex. 6 at 3.) Regardless, at her deposition, Whited testified that, if the van's absence ever prevented the plaintiffs from traveling within the park, they were not disciplined for failing to clean cabins. (Docket No. 24, Ex. 2 at 119.) She also testified that, if the plaintiffs asked their co-workers where the vehicle was, "somebody would laugh or snicker." (*Id.*) At most, then, the van-related incidents appear to be pranks by the plaintiffs' co-workers, which are examples of the "trivial harms" that are not actionable under Title VII. *See Burlington*, 548 U.S. at 68. This is not the sort of activity that would discourage an employee from reporting a supervisor's sexual misconduct.

The plaintiffs also point to incidents in which someone cut the wires in their personal radio and destroyed a stuffed animal. But, again, there is no evidence that Davis was the person

---

unconvincing, in light of the evidence that Mabry and Davis attempted to coach Whited's testimony to the investigators.

[5] The affidavit of Donnie Davis, the plaintiffs' co-worker, merely states that he "personally observed vehicles being hidden or the keys being removed." (Docket No. 34 ¶ 10.) It does not state *whom* he observed hiding the vehicles or keys.

who did this. Furthermore, these incidents occurred in the "fall or winter" of 2008 (Docket No. 24, Ex. 2 at 122), or at least five months after TDEC's investigation. Without more, nothing indicates that these isolated incidents had a causal connection to the plaintiffs' cooperation with the investigation. *See Mickey*, 516 F.3d at 525. Similarly, Long once sat on a tack that had been placed on a chair, but nothing suggests that this was related to the investigation. At her deposition, Long admitted that she "[couldn't] say it was put there for [her]" and that it was "[p]robably just a joke." (Docket No. 24, Ex. 4 at 70-71.)

Finally, the plaintiffs complain that, after Cole became superintendent and placed the plaintiffs under Stover's supervision, the changes to their work routines isolated them from their co-workers. Specifically, they claim that: (1) they are required to clock in at an office, instead of at the maintenance shed; (2) they are required to sign sheets that list and track their work assignments, while other maintenance employees are not; (3) they are required to radio their supervisor after the completion of every task, while other maintenance employees are not; (4) they are required to work Sundays during the summer; (5) they are sometimes separated from each other during their tasks, with each plaintiff working alongside seasonal laborers; and (6) Cole told them to limit their time in the maintenance shed.

First, with the possible exception of being forced to work on Sundays, none of these items constitute materially adverse employment actions, because they would not discourage a reasonable employee from reporting misconduct. None of the administrative changes appear burdensome; in fact, Whited testified that limiting the plaintiffs' time in the maintenance shed is "good" (Docket No. 24, Ex. 2 at 99), and Long testified that she was "not really complaining"

12

about the changes (*id.*, Ex. 4 at 60). The changes to the plaintiffs' clock-in procedure are trivial, as is the requirement that they carry radios. It is also unremarkable that, on occasion, the plaintiffs are separated so that they can clean different cabins.

Second, the plaintiffs have not shown a causal connection between these changes and the TDEC investigation. Cole did not become superintendent until October 2009; before that, he worked at a different park. There is no apparent reason why Cole or Stover would retaliate for something that happened a year and one-half earlier and had no direct effect on them. Indeed, the plaintiffs' own evidence shows that Cole was sympathetic to them. (*Id.* at 80 (Long's testimony stating that Cole told her, "[I]f I had been here [after the Christmas party], I would have fired some of them. I would have sent some of them to jail"); Docket No. 33 ¶ 7 (affidavit of a co-worker stating that Cole told her that "Ms. Long and Ms. Whited had been treated poorly" and that he "'hope[s] they get a million dollars'").) The plaintiffs' deposition testimony also supports the conclusion that these changes were not motivated by retaliation. (Docket No. 24, Ex. 2 at 93 (testimony of Whited acknowledging that it is "possible" that Stover simply runs things differently than Davis), 95 (stating that she was "not sure" that the radios were retaliatory), 112 (stating that she "didn't know exactly the reasoning" behind Cole's decision to place the plaintiffs under Stover); *id.*, Ex. 4 at 61-62 (testimony of Long admitting that the new sign-in procedures "might be" an improvement).)

Third, even if these changes could support a prima facie claim of retaliation, the defendant has offered legitimate reasons for the administrative changes that Cole and Stover made. In his affidavit, Cole states that he placed the plaintiffs under Stover's supervision so that

13

Davis could focus on maintenance issues, as opposed to housekeeping issues. (Docket No. 24, Ex. 6 at 1-2.) He also states that the daily assignment sheet helps Stover track which cabins are ready for rental and that the radios allow Stover to have instant information regarding cabin availability. (*Id.* at 2.) Furthermore, Cole required the plaintiffs to work on Sundays "so that cabins could be cleaned on Sundays because most visitors check out on Sundays."[6] (*Id.* at 3.) The plaintiffs have not shown that these proffered reasons are pretextual.[7] Instead, at her deposition, Whited agreed that Cole runs the park "more efficiently and effectively" than his predecessors did. (Docket No. 24, Ex. 2 at 127.)

In sum, the plaintiffs may proceed with their retaliation claim, to the extent that it is based on (1) Davis's and Mabry's conduct and (2) the plaintiffs' increased workloads or change in work assignments in the months following the investigation. They have not sufficiently shown, however, that the remainder of the alleged conduct was actionable or retaliatory.

## **CONCLUSION**

For the reasons discussed herein, the defendant's Motion for Summary Judgment will be granted in part and denied in part. The plaintiffs' claims for sexual discrimination and hostile

---

[6] The plaintiffs still receive two consecutive days off of work each week. (Docket No. 24, Ex. 6 at 3.)

[7] Cole's affidavit further states that the plaintiffs were separated during the summer months "so as to allow them to supervise the seasonal workers who are unfamiliar with procedures." (Docket No. 24, Ex. 6 at 2.) In response, Long's affidavit states that she "[doesn't] remember supervising anyone" (Docket No. 32 ¶ 5), and Whited's affidavit states that "[they] certainly worked with seasonal workers, but [they] did not supervise them" (Docket No. 31 ¶ 10). But, even if the plaintiffs were not officially supervising the seasonal workers, this does not contradict Cole's assertion that the plaintiffs were separated so that they could both assist seasonal workers with housekeeping procedures.

14

work environment will be dismissed. The retaliation claim, as limited herein, will remain for trial.

An appropriate Order will enter.

_____
ALETA A. TRAUGER
United States District Judge